## UNITED STATES v. KRAUSE.

(First Division. Juneau. October 2, 1916.)

No. 1152–B.

CRIMINAL LAW ☜369(2)—EVIDENCE—OTHER OFFENSES.

On the trial of the defendant, charged with murder of one Plunkett, the United States offered to introduce evidence of prior mysterious disappearances of men last seen with the defendant, and of certain crimes committed by the defendant in connection with said other disappeared persons. *Held*, to make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish. The evidence offered cannot be so connected with the charge against the defendant, and is denied.

James A. Smiser, U. S. Dist. Atty., of Juneau.
Kazis Krauczunas, of Seattle, Wash., for defendant.

JENNINGS, District Judge. In the matter of the introduction of evidence which was offered by the government to prove certain things, in order to convict, the government, in this case, must prove: (1) That Plunkett is dead; (2) that Krause killed him; (3) that the killing was done with felonious intent.

To my mind there is already sufficient evidence to go to the jury on all those points; but the government offers to introduce evidence of prior mysterious disappearances of men last seen with the defendant, and of certain crimes committed by the defendant in connection with said other disappeared persons.

Underhill on Criminal Evidence, § 87 (and other text-writers on evidence), lays it down that there are five exceptions to the rule excluding evidence of former crimes, and he says those exceptions "are carefully limited and guarded by the courts, and their number should not be increased." Considering these exceptions seriatim, with a view of determining whether the offered testimony in this case comes within any one of them, it is to be observed that the first exception is this:

"If several similar criminal acts are so connected by the prisoner, with respect to time and locality, that they form an inseparable transaction, and a complete account of the offense charged in the indictment cannot be given without detailing the particulars of such other acts, evidence of any or all of the component parts thereof is admissible to prove the whole general plan."

Manifestly the offered testimony cannot come in under that exception, because there is no connection between the killing of Plunkett and the things done in connection with the others; one does not embrace and is not embraced by the other, nor does one lead up to the other.

In commenting on this exception Justice Agnew, in Shaffner v. Com., 72 Pa. 67, 13 Am. Rep. 649, says:

"To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish."

This seems to be a leading case on this exception. It is cited from with approval in the great Molineux Case as follows: After reviewing all the authorities, the court comes to this Shaffner Case:

"We will now quote from a single authority, which clearly and succinctly prescribes the limitations of this exception, and the reasons for careful judicial discrimination in its application. In Shaffner v. Com., 72 Pa. 63, 13 Am. Rep. 651, the highest court of Pennsylvania said: 'To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor by a connection which shows that he who committed the one must have done the other. Without this obvious connection, it is not only unjust to the prisoner to compel him to acquit himself of two offenses instead of one, but it is detrimental to justice to burden a trial with multiplied issues that tend to confuse and mislead the jury. The most guilty criminal may be innocent of other offenses charged against him, of which, if fairly tried, he might acquit himself. From the na-

ture and prejudicial character of such evidence, it is obvious it should not be received unless the mind plainly perceives that the commission of one tends, by a visible connection, to prove the commission of the other by the prisoner. If the evidence be so dubious that the judge does not clearly perceive the connection, the benefit of the doubt should be given to the prisoner, instead of suffering the minds of the jurors to be prejudiced by an independent fact carrying with it no proper evidence of the particular guilt.' This statement voices the keynote of the distinction between the civil law and our own more merciful common law. Under the former there is no presumption of innocence. A mere official charge of crime puts the accused upon his defense. His history is an open book, every page of which may be read in evidence by the prosecution. Every crime or indiscretion of his life may be laid bare to feed the presumption of guilt. How different is our own common law, which is the product of all the wisdom and humanity of all the ages! Under it the accused comes into a court of justice panoplied in the presumption of innocence, which shields him until his guilt is established beyond a reasonable doubt. His general character can be thrown into the balance by no one but himself. The incidents of his life, not connected with the crime charged, are his sacred possession. He faces his accuser in the light of a distinct charge, with the assurance that no other will be or can be proved against him."

The third exception is this:

"If the facts and circumstances tend to show that the prisoner committed an independent dissimilar crime, to enable him to perpetrate or to conceal an offense, such evidence is admissible against him upon an indictment charging the auxiliary crime, when the intent to perpetrate or conceal such offense furnished the motive for committing the crime for which he is put upon trial."

It is evident that the offered testimony cannot be received under this exception, for it is not claimed that the commission of these other crimes was for the purpose of aiding or assisting in the perpetration of the crime on Plunkett.

The fourth exception is this:

"When a crime has been committed by the use of a novel means or in a particular manner, evidence of the defendant's commission of similar offenses by the use of such means or in such manner is admissible against him, as tending to prove the identity of persons from the similarity of such means, or the peculiarity of the manner adopted by him."

The offered testimony might come under this exception if the offer went far enough—if, for instance, it were an offer to show that the defendant killed Ekram, Yamamoto, Moe, and Christy by the use of novel means or in a particular man-

ner, and that these novel means or that particular manner were the same means and manner by which Plunkett was killed. But it is not such an offer. The means and manner of Plunkett's death are unknown, and so set out in the indictment, and there is no offer to prove how Ekram, Yamamoto, Moe, and Christy came to their deaths, or even that they are dead. The offered testimony, if received, would reveal, if anything that these others were decoyed to a lonely place, and their property taken or attempted to be taken by means of forgery. As crimes go there would be nothing novel in such a proceeding.

The fifth exception is this:

"When a prisoner is charged with any form of illicit sexual intercourse, evidence of the commission of similar crimes by the same parties is admissible to prove an inclination to commit the act for which the accused is put upon his trial."

Manifestly it does not come under that exception.

Reverting now, to the second exception, which is this:

"When the commission of the act charged in the indictment is practically admitted by the prisoner, who seeks to avoid criminal responsibility therefor by relying upon the lack of intent or want of guilty knowledge, evidence of the commission by him of similar independent offenses before or after that upon which he is being tried, and having no apparent connection therewith, is admissible to prove such intent or knowledge, which has become the material issue for trial."

Wigmore does not entirely agree with this, for he says (1 Wigmore, § 363):

"The intent principle receives constant application; for the intent to kill is in homicide practically always in issue, and is to be proved by the prosecution, and the recurrence of other acts of the sort tends to negative inadvertence, defensive purpose, or any other form of innocent intent. For this purpose, therefore, the evidence is receivable, irrespective of whether the act charged is itself conceded or not. Where (as usually) it is not conceded, the evidence of intent goes to the jury to be used by them only on the assumption that they find the act to have been done by the accused; it is then to be employed by them in determining the intent."

And then, as showing the rationale by which such evidence is admitted, in section 302 he gives several extended quotations which I will not read.

The last sentence in Wigmore is to my mind very significant:

"Yet, in order to satisfy this demand, it is at least necessary that prior acts should be similar."

The government's offer stops short of an offer to prove a prior similar act of murder. It only offers to prove a prior similar last known appearance, a prior similar forgery or attempted forgery, a prior similar appropriation of another's property, for none of which, and for the like of none of which, is the defendant on trial. The proof, therefore, of defendant's intent in the doing of any or all of these things would be no proof of his intent to kill Plunkett. These are not acts for the purpose of getting Plunkett's money, and the doing of these things would be no proof of an intent to kill Plunkett for the purpose of getting his money.

When proof of other crimes is admitted to show intent, it must be to show intent to do the specific thing charged, as contradistinguished from a general criminal motive or criminal occupation. Note, 105 Am. St. Rep. 990.

The principle of showing intent by showing design or system is on the theory:

"That a design or plan in the defendant is to be shown as making it probable that the defendant carried out the design or plan and committed the act." 1 Wigmore, § 363.

But, even so, what would it be a design or plan for? Why, for decoying these other parties and getting their money; but there, under the offer, the criminal agency of the defendant ends, for men often disappear without having been killed, and it is not offered to prove that defendant was responsible for or did anything to bring about their disappearance.

"Besides, the naked fact that the same means were used in the two cases would simply prove that two distinct crimes may have been committed by the same person by similar means." Molineux Case, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 267.

If admitted, I would have to charge the jury that they must not take those circumstances for anything, unless they believe beyond a reasonable doubt that those men were murdered, and not simply disappeared. State v. Prins, 113 Iowa, 72, 84 N. W. 980. The offer does not embrace such an assertion, but only that they disappeared. The jury would have to in-

fer ·that they were murdered, and it would be an inference based on circumstantial evidence; and from· the finding of certain facts based on inferences they would be asked to infer still further, to wit, that the death of Plunkett was caused with the same intent.

The Molineux Case presents a stronger case for the introduction of proof of other crimes than does the case at bar. That was a case of poisoning. Cornish (or rather his unintended proxy Mrs. Adams) was killed by means of a subtle and deadly poison sent through the mails. I think that was the first instance of a man being charged with such a crime, although there have been such instances since. The poison was sent through the mails in the shape of a present to a person. The defendant was shown to be well versed in the properties of poisons. His connection with poisons was well shown. It was shown, over objection, that just 18 days prior to sending the poison to Cornish he had sent poison through the mails to one Barnett. The Supreme Court of New York reversed the case in a very able and lengthy opinion, in which the authorities were reviewed at length. In the course of its opinion the court says:

"The methods referred to are as identical as any two shootings, stabbings, or assaults, but no more so."

The standing of the court and the eminence of the counsel engaged forbid that the decision be lightly regarded.

I think it would be exceedingly doubtful and dangerous to allow the offer. The offer is therefore denied.